ARTHUR J. COYLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

THOMAS W. CRAGG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BENJAMIN H. ORR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOHN G. WINANT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24513, 28293–28295.   Promulgated September 20, 1929.

*J. S. Y. Ivins, Esq.*, for the petitioners.
*C. E. Lowery, Esq.*, and *Eugene Meacham, Esq.*, for the respondent.

OPINION.

MILLIKEN: The contract between petitioners and the Wichita Petroleum Co. was construed in *Wichita Petroleum Co.* v. *Winant*, 295 Fed. 67, and it was there held that the only period of time referred to in the contract was the period "commencing at midnight December 1–2, 1921, and ending at midnight October 1–2, 1922," with the result that petitioners were entitled to be paid, in addition to the total cash payments aggregating $225,000, an amount equal to one-half of the proceeds of all oil produced from the three-fourths interest in the lease, that being petitioners' interest which was subject to two overriding royalties of one-eighth each. Giving to the contract the construction placed thereon by petitioners, it appears that they sold to the Wichita Petroleum Co. hereafter referred to as the Wichita Company, all the oil produced from their three-fourths interest during the "period" for the sum of $25,000 cash and other cash payments, amounting in all to $225,000, plus an amount equal to the proceeds of one-half the oil produced during said "period" with an option on the part of the Wichita Company to purchase their interest in the lease for the sum of $25,000 plus the difference, if any, between the sum of $625,000 and the amount already paid for the oil; the said difference to be paid out of one-half of the proceeds of oil produced from the said three-fourths interest.

Respondent insists that petitioners were endeavoring to evade income tax and that this was the purpose they had in view when the contract was drawn. We see no fraud in the case. Petitioners submitted with their income-tax returns a copy of the contract, together with a short statement of its history. Respondent was given full notice of what had occurred and in computing the deficiency evidently relied upon the contract, a copy of which was furnished him by petitioners. The real question, then, is whether by reason of the contract petitioners should or should not be given the benefit of deductions by reason of depletion, and this turns on the effect and character of the contract. The issue is whether petitioners fall inside or outside the line prescribed by the revenue act. See *Bullen* v. *Wisconsin*, 240 U. S. 625.

In order to get a clear view of the whole situation, we will first view it as of the date the contract was made and then look at what actually resulted. The testimony given at the hearing discloses that the representatives of the Wichita Company were anxious to purchase outright but does not disclose the terms of their offer. Those terms appear in the opinion in *Wichita Petroleum Co.* v. *Winant, supra.* There it appears that the offer was to purchase the lease for the sum of $650,000, of which the sum of $250,000 was to be paid in installments by March 5, 1922, and the remainder out of the proceeds of the sale of oil. The contract we have before us was to the effect that the sum of $225,000 was to be paid in cash and in addition for the period December 1-2, 1921, to October 1-2, 1922, petitioners were to receive an amount equal to one-half of the sale price of the oil, and the Wichita Company was given an option to purchase the petitioners' interest in the lease for the sum of $25,000, plus the difference between $625,000 and what had been paid by the latter date. In both cases the ultimate amount to be paid was the same. The difference consists in the terms contained in the proposed contract and those contained in the final agreement. A pertinent fact that confronted petitioners at the time the contract was entered into was that theirs was the first oil produced from Woodbine sand. Their well came in at a temperature of about 120 degrees, which indicated a proximity of salt water and that the well might soon cease to produce oil in paying quantities. It appears that the life of the oil production was at this time quite problematic. The whole matter had the aspect of speculation. The purpose of petitioners was to preserve to themselves the right to a deduction for depletion. For this purpose they were willing to reduce the amount to be paid in cash to the extent of $25,000, making that sum the amount to be paid if the option were exercised. They waived the absolute right to receive an amount equal to one-half the proceeds of the oil during the life of the lease, making the latter right dependent upon the amount of oil produced before October 2, 1922, and also dependent upon whether the Wichita Company exercised its option. On this point the attorney, who drew the contract and who was also attorney in fact for petitioner Winant, having stated that there was considerable doubt at the time the contract was executed as to what would be the situation on October 1, 1922, testified as follows on cross examination:

Q. By that do you mean you were in some doubt as to whether you were going to get all of your money under the contract by reason of the wells petering out?

A. Yes. We figured we were taking considerable chance based on what was known of the Mexia field at the time this contract was made, that is, against an outright sale in getting our full consideration at the time of the contract, as

against a deferred sale until some time quite in the future, and we were taking a very real risk, but it was one that was worth taking.

Next, looking backward, we find these fears verified to a certain extent. Instead of the three-fourths interest in the lease producing oil to the extent that one-half thereof would be equal to the amount of $400,000, the total sales of oil from that interest produced only $449,-876.02, of which petitioners were entitled to an amount equal to one-half. The result was that on October 1, 1922, petitioners had received and were entitled to receive cash payments amounting to $225,000, and to receive from oil the amount of $224,938.01, or a total of $449,938.01. In fact, by reason of litigation petitioners received prior to October 1, 1922, only the amount of $297,305.14. To put it another way, the Wichita Company received $61.99 less for oil sold than it paid or owed to petitioners for the oil purchased, and in addition paid all expenses of operation and state production taxes. The result of this was that before the Wichita Company could exercise its option, it would be compelled to pay petitioners the sum of $25,000 and agree that out of the oil produced, subject to prior royalties, it would pay to them the further sum of $175,061.99. The final outcome was that the Wichita Company executed this option and instead of paying petitioners the total sum of $650,000, they actually paid them the sum of $635,000. The fact that petitioners, by taking the course they did, might have achieved the same result which would have resulted from the contract offered by the Wichita Company is not conclusive that taxes have been evaded rather than avoided. See *United States* v. *Isham*, 17 Wall. 496, where the court pointed out that one could avoid a stamp tax on checks for $20 or more by issuing several checks for less than that amount. The true question is whether the contract, taken as a whole, was a contract of sale of the lease or was a contract of sale of oil coupled with a bona fide option to purchase the lease.

We are not bound by the recitals of the contract nor by the particular terms used in any one paragraph but should construe the paper as a whole. The fact that it purports to sell the oil rather than the lease is not controlling if the contract taken by its four corners discloses a contrary contention. See *Heryford* v. *Davis*, 102 U. S. 235. Neither are we bound by the fact that the contract purports to vest in the Wichita Company an option, if in fact there was no real room for choice. See *In re Sheets Printing & Mfg. Co.*, 136 Fed. 989; *Corbett* v. *Riddel*, 209 Fed. 811; *Burroughs Adding Machine Co.* v. *Bogden*, 9 Fed. (2d) 54.

If we do not take into consideration the surrounding facts and circumstances and the nature of the property involved, we might at

first blush be impressed by the fact that the contract proposed by the Wichita Company and the one actually executed would in the end, if carried out, reach precisely the same result. The exception " if carried out " is the flaw in the statement. The Wichita Company was not obligated to operate the lease beyond midnight of October 1–2, 1922. It would and must have stopped at that date unless it paid the sum of $25,000 and agreed to pay out of oil the difference, if any, between the amount of $625,000 and the amount representing one-half of the oil to be produced during the " period " from the three-fourths interest. Looking at this proposition as of the date of the contract, it would seem that it was by no means certain that the Wichita Company would exercise its option. The oil was being produced under new conditions. Its temperature did not indicate a long life of production. It could not then be said how much would be paid out of the oil prior to October 1, 1922, nor how much would have to be paid out of oil subsequent to that date. The amount of $25,000, especially when taken in connection with the exhausting nature of the property, was no small amount. It is true that it might be expected that by October 1, 1922, the Wichita Company's investment would be quite large, but it should be remembered in this connection that we are not dealing with lasting property such as land or houses, but with a class of property which is exhausted by every barrel of oil extracted, with the result that the payments to be made under the option might be out of all proportion to the then remaining value of the property. Petitioners were confronted on the one hand with large immediate profits coupled with high taxes and on the other with a chance to lose some of their profits but with the result of lower taxes. Taking into consideration all the facts presented, we are convinced that in adopting the course they did, petitioners took a real bona fide chance to lose some of their gain. As it turned out, the Wichita Company was compelled to agree to pay out of oil production the further sum of approximately $175,000, in addition to the sum of $25,000 in cash. We think that at the outset it was by no means certain that the Wichita Company would exercise its option and are therefore of opinion that the contract was a contract of sale of oil coupled with a bona fide option to purchase the lease.

The rights of an optionee are thus stated in Thompson on Real Property, vol. 5, sec. 4287 (h) :

INTEREST OF OPTIONEE.—An option does not pass to the optionee any interest in the land; but a contract of sale does transfer to the vendee an interest in the land; and therefore a person appearing in the character of an optionee possesses nothing except the right to elect to buy, and he has no interest in the land until, by his acceptance of the option, he transforms the option into a contract of sale and changes his character from that of an optionee to that

of a vendee. So long as a person stands in the position of an optionee, his rights are those of an optionee, and his rights as a vendee do not come into existence until he occupies the position of a vendee.

A case in which the facts were very much like those in these proceedings is *Phenix Insurance Co.* v. *Kerr*, 129 Fed. 723. The question in that case was whether Kerr was within the meaning of the provisions of a fire insurance policy the sole and unconditional owner of a grain elevator which had been burned. The facts were thus stated by the court:

* * * The evidence was that Kerr bought, paid $6,000 for, and took the title to the elevator. Thereupon he made a written agreement with Rundberg & McCann to the effect that they should have the possession and use of the property for a monthly rental of $100 and for the payment of the premium on the insurance; that they should be at liberty to pay more than $100 per month if they saw fit; that, if they failed to pay as much as that amount for two successive months, the contract should cease, and Kerr should retain the moneys he had received, but that, if they should continue to make the payments until they should aggregate $6,000 and interest at 10 per cent per annum, Kerr would convey the elevator to them. When the loss occurred, Rundberg & McCann were not in default. They had paid about $1,200 under this contract, and they were in the possession of the property. * * *

After stating that under a contract of sale and purchase the vendee is the one who suffers loss, the court proceeds:

* * * But if the owner gives to another the option to purchase a piece of property, and the latter does not irrevocably accept the offer and definitely agree to make the purchase, the loss of its injury or destruction falls upon the owner of the property, and not upon the owner of the option, because the latter is not bound to take or pay for the property, and he cannot be compelled to do so. And, while the owner of the option may accept it, and compel the owner of the property to comply with its terms, until the owner of the option does so he has no interest in the property. He has nothing but a mere right to acquire an interest, and this is neither the ownership nor any interest in the property which impinges upon its unconditional ownership by him who gave the option. *Richardson* v. *Hardwick*, 106 U. S. 252, 254, 27 L. Ed. 145, 146, 1 Sup. Ct. Rep. 213; *Gustin* v. *Union School District*, 94 Mich. 502, 34 Am. St. Rep. 361, 54 N. W. 156. The result is that the owner of property who has given an irrevocable option to purchase it to one who has not agreed to accept the option or to buy or to pay for the property still has the unconditional ownership of it within the proper interpretation of the clause upon that subject in policies of insurance, and he may maintain an action upon a policy for injury to it by fire. The plaintiff was in that situation. He was the owner of the elevator. He had given an option to purchase it to Rundberg & McCann. They had paid $1,200 for that option, and in partial acceptance of it, so that it had become irrevocable. But they had not agreed to complete their acceptance, or to buy the property, and they were not bound to take or to pay for it. They had no interest in it, but a mere right to acquire an interest which they were at liberty to enforce or to abandon. The interest of the plaintiff was the sole and unconditional ownership, and his action upon the policy was well brought.

From the above, we conclude that if the Wichita Company had not exercised its option there can be no question that the title to the lease

would have remained in petitioners, with the consequent right to deduction for depletion. What effect then does the fact that the option was exercised have upon the question involved?

At this point, respondent contends that when the Wichita Company exercised its option it was to " be considered as the owner *ab initio*," and in support of this contention cites *Kerr* v. *Day*, 14 Pa. St. 112; *Peoples Street Ry. Co.* v. *Spencer*, 156 Pa. St. 85; 27 Atl. 113; *Bauer* v. *Hill*, 267 Pa. 559; 110 Atl. 346; *Crossman* v. *Insurance Co.*, 198 Mich. 304; 164 N. W. 428; *Crowly* v. *Byrne*, 71 Wash. 444; 129 Pac. 113. While there is language used in the above cases which, if taken out of its context and apart from the facts and questions involved, could possibly be construed to sustain respondent's contention, nothing can be found in any one of them to the effect that an optionee, upon the exercise of his option, becomes the owner of the property from the date of the option. All that was in fact decided in the *Kerr* and *Crowly* cases was that one who purchased with notice of an outstanding option, purchased subject to the option. The *Bauer* case related to a contract of outright sale—no option was involved. The *Spencer* case related to the proceeds of a fire insurance policy. It was there held that an option contract contained in a lease taken in connection with a deed of the same date, was only a method of securing a loan made by the optioner to the optionee. All that was decided in the *Crossman* case was that one who acquired for a valuable consideration an option on property had an insurable interest in the property. The *Day* and other Pennsylvania cases are largely based on the English case of *Lawes* v. *Bennett*, 1 Cox. Ch. Cas. 167, and other English cases following that case. In the *Lawes* case it was held that where one had given an option on real estate and after his death the optionee exercised the option, the realty was converted into personalty and the proceeds went to the next of kin and not to their heir at law. This case, though followed, has not received the unqualified approval of the English bench. See Note 57, L. R. A., pp. 651, 652, and *Smith* v. *Lowenstein*, 56 Ohio State 346; 34 N. E. 159. That such conversion is a purely equitable fiction is shown by the decision of Lord Eldon in *Townley* v. *Bedwell*, 14 Ves. 591. There one had executed a lease containing an option to purchase. After his death the lessee exercised his option. The contest was between the heir at law and the next of kin. Lord Eldon followed *Lawes* v. *Bennett*, and held that the purchase price went to the next of kin, and referring to that case said: " That case was very much argued and I do not mean to say that a great deal may not be urged against it." On the other hand, and this is the part of the opinion applicable to these proceedings, he decreed that the heir at law was entitled to the rents up to the date of the exercise of the option, thus clearly deciding that no conversion in fact took

place until the actual sale. In another English case, *Edwards* v. *West*, 6 Ch. Div. 858, the facts were that the landlord covenanted to insure and the tenant had an option to purchase. Before the time of exercising the option, the leased buildings burned and the landlord received the insurance money. The tenant then exercised his option and claimed the insurance money as part of his purchase on the ground that his option, when exercised, related back to the date of the option. This the court denied, saying:

In the first place, it has been said that by the law of England the exercise of the option causes it to relate back to the time of the creation of the option in such a manner as to render the property for this purpose property of the purchaser as from the date of the contract which gave the option; so that here, although the option was given by contract made in April and not exercised until the 28th of September, yet that when it was so exercised, on the 28th of September, it operated retrospectively, and made the property the property of the purchaser as from the month of April preceding, and consequently made the vendor trustee of the fruits of the property for the purchaser. Now it appears to me that such a conclusion would be highly inconvenient, because it would place a person under the obligations which rest upon a trustee, or make him free from them, by reference to the act which was not performed until a future day; and the retrospective conversion of a person into a trustee of property is a result eminently inconvenient. * * * According to the view which I conceive to be true, the conversion of property, which means the treating it as belonging to somebody else before it has been actually transferred to that other person, results from a contract which can be specifically enforced; so that, where there is no specific performance of contract possible, there is no conversion. It flows in effect from the principle of equity which considers that done which ought to be done, and which the court can compel to be done, and it extends so far back as those circumstances exist, and no further. In other words, where there is a contract capable of being specifically enforced as from the date of that contract, and neither earlier nor later, the property comprised in the contract is deemed to belong to the purchaser, and the money to be paid is deemed to belong to the vendor, because those two things ought to be done; but here there is no obligation to do them at any earlier date than that of the contract constituted by the exercise of the option. The conversion cannot, according to the principle, relate back to an earlier date than the contract which gives rise to it.

To the same effect see *Caldwell* v. *Frazier*, 65 Kans. 24; 68 Pac. 1076. On this question it is said in Thompson on Real Property, vol. 5, sec. 4287(h):

When, by accepting an option, a person changes his position from that of an optionee to that of a purchaser, the interest in the land created by the contract of sale dates, in most jurisdictions, from the date of the contract of sale, and is not, by force of fiction, deemed to date from the date of the option.

Whatever may be the merits of this fiction when applied to the devolution of estates, it can find little, if any, place in income-tax law. Our various revenue acts make the taxable year, whether calendar or fiscal, the period for which all income must be returned and taxed. Except for the net loss provisions in the various revenue

acts, the net income for the taxable year is dependent on what occurred in that year. While it is true income and losses may be accrued by one who keeps his books on that basis, yet such accruals must be based on what actually occurred in the taxable year. If we admit the fiction here asserted by respondent, we will find one returning and properly returning as rent what he received from a lease and years afterwards we will find the same person compelled to return such rentals as purchase money received. The contract we have before us runs through two taxable years and it would be quite peculiar to hold that petitioners were the owners of the lease during December, 1921, but that they were not owners of the lease from that time on to the time of execution of the option. The contention made by respondent is based entirely upon a fiction. Tax laws deal with realities. Taxes "are not laid upon abstractions." *Edwards* v. *Slocum*, 287 Fed. 651; affd., 264 U. S. 61. We find no merit in this contention.

We are of opinion that petitioners were the owners of their three-fourths interest in the lease up to midnight October 1–2, 1922, with the result that they are entitled to deductions for depletion up to that date. This disposes of petitioners' alternative contention, that they should be taxed under section 211(b) of the Revenue Act of 1921.

*Judgment will be entered under Rule 50.*